**PRICE v. McANELLY et ux.   (No. 7589.)***

(Court of Civil Appeals of Texas. San Antonio. Oct. 6, 1926.)

**1. Husband and wife** ☞248½.

Where, in exhibition of whole title, it appears its origin preceded marriage, it is separate property of spouse in whom it originated.

**2. Husband and wife** ☞254.

Where community funds are used to complete a title partially earned prior to marriage, community is entitled to reimbursements, which become charge upon property.

**3. Husband and wife** ☞262(2).

Where one seeks to charge estate with community funds used to complete title partially earned prior to marriage, burden of showing such disbursements rests on him.

**4. Deeds** ☞108.

Where two deeds between same parties, equally effective in conveying title, stand unimpaired upon record, first will be given precedence because of priority, in absence of facts disclosing intention of grantor.

**5. Husband and wife** ☞248½—**Where grantor conveyed property to grantee on yearly payments, and after grantee's marriage conveyed same land to grantee for cash sum, property held grantee's separate estate.**

Where land was conveyed before grantee's marriage for consideration of $125 annually during grantor's life, and after grantee's marriage, same grantor conveyed same land to grantee for cash sum, no reference being made to first conveyance, property *held* separate estate of grantee and not community property.

**6. Wills** ☞467.

Mere declaration of testator that property is part of community estate does not serve to give it that status in face of facts showing otherwise.

**7. Homestead** ☞95—**Establishment of homestead on property did not affect existing trust deed or power of owner to renew or extend it.**

Establishment of homestead on property did not impair existing deed of trust lien or power to renew or extend it, since lien had become vested in creditor before homestead character was impressed upon property.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error dismissed for want of jurisdiction November 24, 1926.

**8. Bankruptcy ⊖═398(3).**

Action of trustee in bankruptcy in setting apart homestead on property on which there was trust deed, did not affect trust deed.

**9. Homestead ⊖═107.**

That renewal note, secured by deed of trust of homestead, was for amount in excess of that properly chargeable against homestead, did not render note and mortgage void, but raised equities which courts would adjust in proper procedure seasonably instituted.

**10. Homestead ⊖═107.**

Where renewal note and deed of trust was for amount in excess of debt properly chargeable against homestead, and mortgagor, with full notice, permitted sale of land under terms of mortgage, he could not question validity of sale or title.

**11. Mortgages ⊖═335.**

Where any part of debt secured by mortgage remains unpaid, power of sale in mortgage may be exercised, even though debt secured is in excess of amount properly chargeable against property.

**12. Homestead ⊖═206.**

Act of mortgagee in releasing part of land from original mortgage and renewing mortgage for entire amount of remainder, including homestead did not release remainder of property, though burden on homestead was thereby increased.

**13. Homestead ⊖═108.**

Where one claiming homestead on mortgaged property permitted whole property to be sold in bulk, he waived right to have nonexempt property sold first.

Appeal from District Court, Medina County; R. H. Burney, Judge.

Trespass to try title by Fannie L. Price against R. R. McAnelly and wife. From a judgment for plaintiff for part of land and for defendants for part, plaintiff appeals. Affirmed in part, reversed in part, and rendered.

Powell & Green, of San Antonio, and Briscoe & Morris, of Devine, for appellant.

Geo. M. Clifton, of San Antonio, and De Montel & Fly, of Hondo, for appellees.

SMITH, J. On October 15, 1879, P. McAnelly conveyed 836 acres of land in Medina county to his son, P. E. McAnelly, then a single man, for a recited consideration "of the sum of $125 to be paid to (the grantor) annually during the term of (the grantor's) natural life." The conveyance was made by general warranty deed, in which the vendor's lien was reserved "to secure the prompt payment of the said amount of money at such times and in the manner above specified." Two years later P. E. McAnelly was married to Mary J. Redus.

On September 4, 1884, the same grantor conveyed the same land by general warranty deed to the same grantee, for a recited consideration of $5,016 in cash. The record discloses no reason for, or explanation of, the second conveyance, in which no reference was made to the first conveyance.

Mary Redus, wife of P. E. McAnelly, died intestate in 1908, survived by seven children and her husband, who died in 1915, leaving a will in which he in effect devised his estate in equal shares to his children, among whom was R. R. McAnelly, who had married Ada Davis in 1911.

Under the terms of his will, the estate of P. E. McAnelly was partitioned among his children in 1917. The 836 acres which had been conveyed to the testator in the two deeds mentioned was apportioned in shares of 290 acres to R. R., 290 acres to Ivy, and 256 acres to Stanley McAnelly, and in October, 1918, Ivy conveyed her share to R. R., whereby the latter's holding in the 836-acre tract was increased to 580 acres.

Shortly prior to his death—that is, on August 1, 1915—P. E. McAnelly executed his promissory note in the sum of $4,000 to Fannie L. Price, together with a deed of trust upon the 836 acres to secure the payment of the note, which was for borrowed money. In this deed of trust the power of sale was placed in the trustee. This note and deed of trust lien were outstanding when P. E. McAnelly died, when the property was partitioned, and when R. R. McAnelly purchased Ivy McAnelly's portion of 290 acres out of the 836, for $836 cash and the assumption by the purchaser of the note due Mrs. Price.

When the estate was partitioned in 1917, R. R. McAnelly sought to establish a homestead for himself and family upon the 580 acres received by him in the partition and in the purchase from Ivy McAnelly.

The note executed in 1915 by P. E. McAnelly for $4,000 matured in July, 1918, but the heirs were unable to pay it, and R. R. McAnelly, appellee, asked for an extension from Mrs. Price. This extension was effectuated through a new note and deed of trust executed by R. R. McAnelly and wife, conveying their 580 acres of the original body of 836 acres; and by separate instrument Mrs. Price released the deed of trust lien from the remaining acreage. In these negotiations McAnelly borrowed an additional $800 from Mrs. Price, ostensibly for the purpose of paying the purchase price of the 290 acres R. R. obtained from Ivy McAnelly. To include this additional loan, the new note was made for $4,800, in lieu of the original obligation for $4,000, and the new deed of trust was made to co-ordinate with the new obligation.

On March 17, 1922, R. R. McAnelly was adjudged a bankrupt in the United States District Court at San Antonio, and on April 22, following, the trustee set apart a specifically described 200 acres of the 580 acres in-

---

volved as being exempt as the homestead of the McAnellys.

Prior to July 4, 1922, the 580 acres had been twice advertised for sale by the trustee under the terms of the deed of trust, but the sales thereunder had been postponed at the instance of the trustee in bankruptcy, acting upon request of appellee, in order to give the latter an opportunity to sell the property to better advantage at private sale. These efforts failed, however, and the trustee under the deed of trust again advertised the property, and, with the knowledge and acquiescence of McAnelly and the trustee in bankruptcy, the entire 580 acres were sold on July 4, 1922, at public sale, to appellant, Mrs. Price, the holder of the note and deed of trust lien, for approximately the amount of the note, including interest and attorney's fees, whereupon Mrs. Price took possession of the property, with McAnelly's acquiescence. The McAnellys made no objection to this sale, and made no effort to require the trustee to first sell the nonexempt portion of the property before offering the homestead. No part of the first or second notes in question was ever paid or tendered to the holder and mortgagee, and no offer thereto was made in McAnelly's pleadings in this litigation.

Subsequently Mrs. Price brought this suit in the form of trespass to try title against R. R. McAnelly and his wife, to recover title and possession of the property in controversy, alleging in the alternative that she was a mortgagee in possession, and praying for foreclosure of the deed of trust lien to secure the payment of the $4,800 note.

In a trial without a jury the court below rendered judgment for Mrs. Price for 380 acres of the 580 acres involved, and for the McAnellys for the remaining 200 acres, free of incumbrance, found to constitute the homestead of the latter, and for $250 damages, and the court canceled both notes and deeds of trust.

Mrs. Price alone has appealed. Appellees have brought forward no cross-assignments of error, and no complaint is made by them of that portion of the judgment decreeing title in appellant to 380 of the 580 acres originally involved in the suit. This appeal therefore concerns only the remaining 200 acres decreed to appellees as their homestead.

At the outset it becomes appropriate to determine the relative effects of the two conveyances from P. McAnelly to P. E. McAnelly, the first having been executed and delivered prior to the latter's marriage, and the second after his marriage. The question is material in determining if the land thus conveyed was the separate property of P. E. McAnelly, or the community property of the latter and his wife. Both conveyances were by general warranty deed; the property conveyed and the grantor and grantee being identical in the two instruments. The recited consideration for the first conveyance was the payment of $125 annually to the grantor during his natural life, and the recited consideration for the second conveyance was $5,016 in cash. In the first conveyance the vendor's lien was reserved, whereas the second conveyance was absolute. The record is silent as to why the second deed was executed. It may have been intended as a new contract between the parties and substituted for the original contract, or as a release of the lien reserved in the first instrument. It may be that the recited consideration for the second deed was paid out of P. E. McAnelly's separate funds, or out of community funds, or in the nature of advancements from P. E. McAnelly's parents, or in settlement of old obligations between them. These are matters of mere conjecture, of course; but the record supplies no better basis for decision. P. E. McAnelly married within two years after the first deed was made and recorded, and before he was required under the terms of the instrument to pay more than $125 of the purchase price of the 836 acres of land involved. The second deed was executed within three years after the marriage. It would be sheer conjecture to surmise that the consideration of $5,016 recited in the second deed was paid out of McAnelly's separate estate, but it would be a matter of like conjecture to surmise that the sum named was taken out of the revenues of the community estate which had existed less than three years.

[1] We conclude that in this state of the record we are obliged to resort to the rule that, where in an exhibition of the whole title it appears its origin preceded the marriage, it is the separate property of the spouse in whom it originated. Giving direct application to this rule, P. E. McAnelly was single when he first acquired title by the executory contract expressed in the deed of 1879, and the right to earn the land acquired by that deed was his separate property. Welder v. Lambert, 91 Tex. 510, 44 S. W. 281.

[2, 3] This disposition of the question does not abrogate or impair the rule that, where community funds are used to complete a title partially earned prior to the creation of that status, the community will be entitled to reimbursements, which become a charge upon the property. For, had it been shown that community funds were used to pay all or a part of the purchase price of the property involved, the community would have been entitled to reimbursements, with which the land would have been charged pro tanto. But the burden of showing the disbursements rested upon the party claiming to have made them, and, when he failed, as in the case here, to make that showing, he could not charge the estate. Welder v. Lambert, supra.

[4, 5] It is true, as appellee urges, that the second deed was made during coverture, but the first deed, made before coverture, cannot be disregarded. It must be given full effect,

in the absence of some definite act of the parties showing an intention to abrogate it. If it had been the purpose of the parties in executing and accepting the second deed to nullify the purport and effect of the first, such purpose could have been clearly disclosed, but was not. The two deeds stand unimpaired upon the record, and, being equally effective in conveying the legal title to the same property, the first will be given precedence because of its priority, in the absence of any facts disclosing the intention of the grantor in making and delivering the second. The result is that the property must be treated as belonging to the separate estate of P. E. McAnelly, who had authority to convey the whole estate therein by the deed of trust executed in 1915 to secure the payment of his obligation of $4,000 to appellant.

The will of the ancestor, P. E. McAnelly, embraced a provision that:

"It is my will and desire that the one-half undivided interest of my deceased wife, May McAnelly, in and to all my property, real, personal and mixed, which as community survivor, I now manage and control, be divided equally, as the law directs, at my death, among our beloved children, Earnest E., Redus R., Wayman W., Gladden C., Paul Desha, and Stanley M. McAnelly."

[6] It is contended by appellees that the recitations in this provision amount to an effectual declaration that the property here involved was a part of the community estate of the testator and his deceased wife, and that the testator therefore had no power, after the death of his wife to incumber more than his undivided half interest in that estate with the mortgage given appellant. But this contention is deemed unsound, first, because the property here involved is not by inference or otherwise included in the community estate referred to in the will; and, second, because the mere declaration of the testator that a property is a part of the community estate would not serve to give it that status in the face of facts giving it the character of separate estate. Kellett v. Trice, 95 Tex. 160, 66 S. W. 51.

It appears that on March 17, 1922, appellee R. R. McAnelly was adjudged a bankrupt in the District Court of the United States at San Antonio. In that proceeding the trustee in bankruptcy set apart 200 acres of the land originally involved in this suit as the homestead of appellee. The record here does not fully disclose the proceedings had in the bankruptcy court, and there is some question as to the sufficiency and conclusiveness of the action of the trustee in setting apart the homestead. But that becomes immaterial, in view of the finding of the trial court, upon sufficient evidence, that the McAnellys established a homestead upon the same premises designated by the trustee in bankruptcy, and before the McAnellys executed the renewal note and deed of trust.

[7] The establishment of the homestead upon the premises did not have the effect, however, of impairing or otherwise affecting the existing deed of trust lien upon the property, or the power of the owner to renew or extend that lien or the debt it secured. The right to collect his debt and enforce his lien had become vested in the creditor before the homestead character was impressed upon the property, and was not affected thereby. Dillon v. Kauffman, 58 Tex. 696.

[8] Nor did the action of the trustee in bankruptcy, in setting apart the homestead as being exempt, have any effect upon the creditor's debt and lien, which remained unimpaired by that act, to be enforced in the state courts; the bankruptcy court having no power or jurisdiction to administer the exempt property or to do anything other than to segregate it from the nonexempt property of the bankrupt, thereby excluding it from the custody and control of that court. Lockwood v. Bank, 190 U. S. 294, 23 S. Ct. 751, 47 L. Ed. 1061.

The original debt in controversy amounted to $4,000, for which appellees' ancestor executed his note as well as a deed of trust upon this as well as other lands. To prevent foreclosure of the lien created in the deed of trust, appellees renewed the obligation with a note for $4,800, being $800 more than the original amount, notwithstanding appellees' homestead claim had attached to part of the land. Appellees also executed a new deed of trust upon the land, including the homestead, to secure the payment of the enlarged obligation. The question arises, what effect, if any, did the increase in the debt and the inclusion thereof in the deed of trust, have upon the validity of the mortgage, the power of sale by the trustee, and a sale thereunder, in so far as the homestead rights were affected?

[9] As has been shown, the intervention of the homestead claim had no effect upon the validity of the debt and lien existing prior to the intervention of that claim. So far as the validity of that debt and lien is involved, the property takes precisely the same status as non-exempt property. It is unnecessary to decide if, under the peculiar facts of this case, the lien was unenforceable in so far as it was based upon that portion of the debt, thereby secured, which was created after the intervention of the homestead claim. For the purposes of this decision, it may be assumed that the after-created portion of the debt could not support the lien in so far as it affected the homestead. For the fact that the renewal note was for an amount in excess of the debt properly chargeable against the property did not render the note and deed of trust void, although it raised equities which the courts would adjust in a proper procedure seasonably instituted. Hemphill v. Watson, 60 Tex. 679; Groesbeeck v. Crow, 85 Tex. 200, 20 S. W. 49; Belcher Co. v. Taylor (Tex. Com. App.) 212 S. W. 647.

The remedy of the mortgagor in such case seems to be to offer to pay what is legally due, before sale of the mortgaged property is made; and, if the tender is rejected, he may restrain the sale by injunction, and procure an adjustment of the equities of the case before the sale will be allowed to proceed. Hemphill v. Watson, supra; Goldfrank v. Young, 64 Tex. 441.

[10] But if the mortgagor, with full notice, sits quietly by and without objection permits the mortgagee, through the trustee, to sell the land under the terms of the mortgage, he cannot question the validity of such sale, or the title thus passed to the purchaser by the trustee's deed. If such sale is regularly made in accordance with the provisions of the mortgage, and the whole estate is sold for more than the amount of the legal debt, then, in a proceeding brought by the purchaser to enforce his title thus obtained, we see no reason why the mortgagor could not, by way of cross-action, recover the excess obtained in the sale over the amount of the legal debt chargeable against the property sold. In this case, however, appellees did not avail themselves of this procedure.

[11] So long as any part of the debt for which the mortgage is given remains unpaid, the power of sale given in the mortgage may be exercised; and the fact that the debt secured by the mortgage is in excess of the amount properly chargeable against the property does not affect the validity of the sale. Groesbeeck v. Crow, supra; Hemphill v. Watson, supra; Belcher Co. v. Taylor, supra.

[12] For like reasons the act of the mortgagee in releasing the lien from a part of the land included in the original mortgage did not have the effect of releasing the renewed lien from the remainder of the property, including the homestead. The maximum effect, if any, of this partial release, was to increase the burden upon the property retained under the lien, including the homestead, and, if this additional incumbrance upon the homestead was unenforceable, the mortgagor could have avoided it by tendering the amount of the debt legally due and restraining a sale until the equities of the transaction were adjusted, as in the case of an excess in the amount of the debt sought to be charged against the property over that legally chargeable thereto.

[13] If by reason of their homestead claim appellees were entitled to have the nonexempt property sold first at the trustee's sale, and sale of the exempt property withheld until a deficiency developed from the sale of the nonexempt property, then it was the duty of appellees to seasonably demand that procedure. By failing to make this demand at the time of sale, and by permitting the whole property to be sold in bulk, appellees waived their right to require segregation.

The change of the form of the original obligation and security therefor, and the release of a part of the security, did not have the effect of waiving or extinguishing the whole of the obligation or security. By express recitals in the deed of trust last executed, both the original obligation and lien to secure it were carried forward, and the mere change in their form did not have the effect of abrogating or impairing the force or effect of either. Hicks v. Morris, 57 Tex. 658; Dillon v. Kauffman, 58 Tex. 696.

The transaction rests in good faith throughout its whole course. The debt was incurred by appellees' ancestor for money lent him in good faith by appellant, the lien to secure it was given upon the land before it was impressed with any of the characteristics of a homestead, and the subsequent intervention of the exemption could not impair or affect it. No part of the debt has been paid, and it was extended and the lien renewed at the instance of appellee.

No complaint is made by appellees of the action of the court in awarding judgment to appellant for 380 acres of 580 acres of land in controversy below, and the judgment will be affirmed in that respect. But, for the reasons given, the judgment awarding to appellees the remaining 200 acres of land involved, and canceling the trustee's deed, will be reversed, and judgment therefor will be rendered in favor of appellant, with all costs.

The original judgment of this court remanding the cause will be set aside, and the opinion thereon withdrawn, and judgment will now be entered as directed above.

Affirmed in part; in part reversed and rendered.

COBBS, J., disqualified, not sitting.